## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 15-cv-02108-REB-STV

BALJIT S. NANDA,

     Plaintiff,

v.

PHILLIPS 66 COMPANY,

     Defendant.

_____

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE
_____

Magistrate Judge Scott T. Varholak

     This matter comes before the Court on four separate motions for partial summary judgment filed by the parties: (1) Defendant's Motion for Partial Summary Judgment on Plaintiff's Tort Claims [#46]; (2) Defendant's Motion for Partial Summary Judgment on Plaintiff's Contract Claim [#76]; (3) Plaintiff's Motion for Partial Summary Judgment on his Affirmative Claim for Breach of Contract [#87]; and (4) Plaintiff's Motion for Partial Summary Judgment on Defendant's Counterclaim [#88], as well as Plaintiff's Motion to Exclude Expert Testimony of Glen Kunofsky [#77]. This Court has carefully considered the motions and related briefing, the arguments presented by the Parties at the October 21, 2016 motion hearing, the entire case file, and the applicable case law. For the following reasons, this Court respectfully RECOMMENDS that:

     (1) Defendant's Motion for Partial Summary Judgment on Plaintiff's Tort Claims [#46] be GRANTED and that summary judgment be entered in favor of Defendant on Plaintiff's three causes of action for fraud;

(2)     Defendant's Motion for Partial Summary Judgment on Plaintiff's Contract Claim [#76] be DENIED;

(3)     Plaintiff's Motion for Partial Summary Judgment on his Affirmative Claim for Breach of Contract [#87] be DENIED;

(4)     Plaintiff's Motion for Partial Summary Judgment on Defendant's Counterclaim [#88] be GRANTED and that summary judgment be entered in favor of Plaintiff on Defendant's counterclaim for breach of Plaintiff's representation and warranty that the stores were in good repair and operating condition; and

(5)     Plaintiff's Motion to Exclude Expert Testimony of Glen Kunofsky [#77] be DENIED.

## I.     BACKGROUND

On February 8, 2013, Plaintiff Baljit Nanda and Defendant Phillips 66 entered into an Asset Purchase and Sale Agreement ("APA") pursuant to which Plaintiff sold gas stations and convenience stores to Defendant.  The APA included an option for Plaintiff to repurchase certain of the stores in and around Kansas City (the "KC Stores") within a certain period of time subject to complying with specified requirements.  On February 28, 2013, Plaintiff and Defendant entered into a written amendment to the APA and, as part of that same transaction, Plaintiff and Defendant executed a Mutual Release.  On July 27, 2013, Plaintiff emailed Defendant documents pertaining to his intent to exercise the option to repurchase the KC Stores.  On August 5, 2013, counsel for Defendant responded that Plaintiff had failed to comply with the APA's requirements for exercising the option within the time limits established by the APA and, thus, that Plaintiff had "no rights" to exercise the option.

On September 24, 2015, Plaintiff filed the instant lawsuit asserting a single claim for breach of contract based upon Defendant's refusal to allow Plaintiff to exercise the option.  Plaintiff subsequently filed an amended complaint adding three additional causes of action for fraud, all alleging that Defendant fraudulently induced Plaintiff to execute the APA by including the option to repurchase the KC Stores, even though Defendant allegedly knew at the time that it would not allow Plaintiff to exercise the option.

In response, Defendant filed a counterclaim for breach of contract against Plaintiff.  Defendant alleges that Plaintiff breached the APA (and amendment thereto) by:  (1) misrepresenting and overstating the amount of accounts and rent receivable purchased by Defendant; (2) representing and warranting that the stores were in good repair and operating condition when they were not; and (3) failing to reimburse Defendant for environmental contamination that existed at the time the transaction closed.

Defendant's Motion for Partial Summary Judgment on Plaintiff's Tort Claims [#46] argues that Plaintiff's fraud claims were released by Plaintiff in the Mutual Release and thus are legally barred.  In response, Plaintiff argues that the release was obtained through fraud and thus should be set aside.[1]  [#60]  In its reply, Defendant argues that there was no misrepresentation or concealment of a material fact because Plaintiff's

---

[1]  Pursuant to Federal Rule of Civil Procedure 56(d), Plaintiff also argued that Defendant's motion was premature because discovery in the case was ongoing.  [#60, p. 11-13].  The discovery period has since expired and Plaintiff has made no attempt to supplement the record with additional evidence.  At the October 21, 2016 motion hearing, counsel for Plaintiff confirmed that Plaintiff does not intend to submit any additional evidence in opposition to the Motion.  Plaintiff's request that the Court "defer considering the motion or allow time for discovery to be completed" thus is moot.

evidence, at most, suggests only that Defendant did not wish to continue doing business with Plaintiff and hoped that he would not be able to exercise the option. [#65].

Defendant's Motion for Partial Summary Judgment on Plaintiff's Contract Claim [#76] and Plaintiff's Motion for Partial Summary Judgment on his Affirmative Claim for Breach of Contract [#87] each offer differing interpretations of the option provisions in the APA in support of their requests for summary judgment on Plaintiff's breach of contract claim. Plaintiff argues that a provision extending the time period for Plaintiff to exercise the option also extended the deadline for Plaintiff to provide notice and documentation supporting his intent to exercise the option. Defendant argues that the notice deadline was not tied to the option period and thus the notice period was unaffected by any extension to the option period.

Plaintiff's Motion for Partial Summary Judgment on Defendant's Counterclaim [#88] seeks summary judgment on Defendant's breach of contract claim based upon Plaintiff's alleged failure to provide the stores in good repair and operating condition as represented and warranted in the APA. Plaintiff claims that Defendant is barred from asserting a breach based upon the alleged condition of the stores, because Defendant violated the APA first by failing to disclose the issues with the stores, which Defendant discovered through inspections conducted prior to the close of the transaction. Plaintiff further argues that summary judgment is appropriate because the evidence establishes that the stores were in "good repair and operating condition" as warranted but that Defendant made alterations to suit its own preferences and to increase the value of the stores for resale. In response, Defendant argues that it was under no obligation to

notify Plaintiff of the defective condition of the stores and that there are genuine issues of material fact regarding the condition of the stores and whether Plaintiff breached his representations and warranties.  [#99].

Finally, Plaintiff seeks to exclude the testimony of Defendant's expert witness, Glen Kunofsky [#77], relating to the meaning of the phrase "major credit grade store tenant" in the APA.  Plaintiff contends that Mr. Kunofsky's opinions would not assist the trier of fact and are not reliable, because the term at issue ("major credit grade store tenant") is unambiguous and Mr. Kunofsky focuses his opinions on a different term not contained in the APA.  Defendant responds that Mr. Kunofsky's testimony is properly admitted even if the term is not ambiguous because the term at issue is a specialized industry term.  [#85].  Moreover, Defendant argues that the criticisms leveled by Plaintiff go to the credibility, not admissibility of the expert's testimony.

## II.    FACTUAL ALLEGATIONS

The undisputed facts are as follows.  On February 8, 2013, Plaintiff and Defendant entered into the APA, pursuant to which Plaintiff sold gas stations and convenience stores to Defendant.  [#60, Undisputed Fact ("UF") 1].  On February 28, 2013, the parties entered into a written amendment to the APA and also a Mutual Release.  [#60, UF 2-3].  The Mutual Release stated that each party agreed to "fully and forever release[]" the other "from any and all causes of action . . . arising from or relating or attributable to any and all acts or omissions . . . occurring prior to the [closing date of the APA transaction]."  [#60, UF 5]. The Closing Date for the APA transaction was February 28, 2013.  [#84, UF 3].

5

Pursuant to sections 3.13.2 and 3.15 of the APA, Plaintiff represented and warranted that the stores were in good repair and in good condition, ordinary wear and tear excepted, and were free from latent and patent defects.  In addition, the parties each agreed to "promptly notify the other party of any fact, event, circumstance or action . . . the existence or occurrence of which would cause any of such party's representations or warranties under [the APA] not to be correct and complete … or [ ] that could reasonably be expected to have a Material Adverse Effect."  [#46-1, § 5.7]. Material Adverse Effect is defined to mean an adverse effect on the assets or business "that equals or exceeds, individually or in the aggregate with other adverse effects, $250,000, as determined by the Buyer."  [#46-1, § 1.1].  Prior to executing the APA, Defendant conducted due diligence by hiring a contractor to visually inspect the stores purchased from Plaintiff.  [#88, UF 6; #99, p. 2].  Defendant received written reports of those inspections, which reflected proposed maintenance expenditures well in excess of $250,000, prior to the closing of the transaction.  [#88, UF 7-8; #99, p. 3 (claiming irrelevant but not disputing); see also #88-7, 88-8, 88-9].  Defendant did not notify Plaintiff of the findings in the inspection reports or of any alleged breach of the representations and warranties in the APA prior to the close of the transaction or at any time prior to this litigation.  [#88, UF 12; #99 p. 3 (disputing duty to notify but not disputing that failed to notify)].

The APA also included an option for Plaintiff to repurchase the KC Stores, in what the APA referred to as the "Option Transaction."  [#84, UF 2].  The APA defined the "Option Period" as "the period beginning on the Closing Date and ending 180 days after the Closing Date."  [#46-1, § 5.16.1].  However, a subsequent provision provided

that if Plaintiff did not receive a $3,250,000 payment due to him from a non-party to the transaction "on or before June 23, 2013, then the Option Period shall not expire until October 31, 2013." [#46-1, § 5.16.1(f)]. It is undisputed that the payment was not made to Plaintiff on or before June 23, 2013. [84, UF 14].[2]

In order to exercise the option, Plaintiff was required to comply with certain specified requirements. One such requirement stated:

> All of the KC Stores will be triple net leased to a major credit grade store tenant (the "KC Stores Tenant") for a term of not less than 15 years (the "KC Stores Lease"), and such tenant and the form of such lease will have been approved by the Buyer, which approval will not be unreasonably withheld.

[#46-1, §5.16.1(a)].

In addition, Plaintiff was required to provide Defendant with the following documentation in advance of closing on the transaction: (1) written notice of his intent to enter into the Option Transaction (the "Option Notice"); (2) a copy of an executed lease for the KC Stores that would become effective as of the closing of the Option Transaction; and (3) written evidence that Plaintiff had obtained a loan commitment for the Option Transaction and that the leasee had entered into a fuel supply agreement. [#46-1, § 5.16.2]. The provision states that Plaintiff shall deliver these documents to Defendant "no later than 150 days after the Closing Date" and that "[t]he closing of the Option Transaction will occur no later than 30 days after [Plaintiff] has timely delivered the Option Notice" to Defendant. [Id.]. The provision concludes by stating: "If [Plaintiff] fails to deliver the written notice within the 150-day period described above, or if [Plaintiff] fails to close the Option Transaction within the 30-day period described above,

---

[2] For purposes of Defendants' motions for summary judgment, Defendant does not dispute the additional undisputed facts offered by Plaintiff in its responses to the

then the option granted herein . . . shall terminate automatically, and the parties shall have no further rights or obligations under this Section 5.16.2." [*Id.*]

On July 27, 2013, Plaintiff sent Defendant an email attaching "documents pertaining to the purchase of Kansas City assets." [#84, UF 9; #76-2]. Specifically, Plaintiff attached a letter from Plaintiff to Defendant, dated July 27, 2016, "providing notice of [his] intent to enter into the Option Transaction" [#76-2] and enclosing a letter from Corner Capital Partners, LLC and an unexecuted lease agreement [#84, UF 9]. Plaintiff acknowledges that he did not enter into a lease for the KC Stores until September 1, 2013, when he executed a lease agreement with Buck's Inc., a subsidiary of Buchanan Energy, Inc. [#84, UF 12].

On August 5, 2013, Defendant responded to Plaintiff through outside counsel, stating that Plaintiff had failed to provide the required documentation within 150-days after the Closing Date and thus that Plaintiff would have "no rights" to enter into the Option Transaction. [#84, UF 13; #94 p. 3 n. 1; #84-5].

On August 19, 2013, Plaintiff sent Defendant a letter stating that the third party payment to him referenced in Section 5.16.1(f) of the APA had not been made on or before June 23, 2013 and "as such the . . . Option Period shall not expire until October 31, 2013." [#84-6]. On August 27, 2013, outside counsel for Defendant responded by stating, *inter alia*, that the Option Period had expired and, even if the Option Period were extended to October 31, 2013, the 150-day deadline for providing the required notice documentation remained in effect and had not been satisfied. [#84-7].

---

motions. [*See* #65, p. 2; #94, p. 3 n.1].

8

Defendant's counsel again stated that Plaintiff had "no rights" to enter into the Option Transaction.  [*Id.*]

## III.    STANDARD OF REVIEW

### A.    Summary Judgment

Summary judgment is appropriate only if "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *Celotex Corp. v. Catrett,* 477 U.S. 317, 322 (1986); *Henderson v. Inter–Chem Coal Co.,* 41 F.3d 567, 569 (10th Cir. 1994).  The movant bears the initial burden of making a *prima facie* demonstration of the absence of a genuine issue of material fact, which the movant may do "simply by pointing out to the court a lack of evidence . . . on an essential element of the nonmovant's claim" when the movant does not bear the burden of persuasion at trial.  *Adler v. Wal–Mart Stores, Inc.*, 144 F.3d 664, 670-71 (10th Cir.1998).  If the movant carries this initial burden, the burden then shifts to the nonmovant "to go beyond the pleadings and set forth specific facts that would be admissible in evidence in the event of trial."  *Id.* at 671 (internal quotation omitted).  To defeat a motion for summary judgment, evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise.  *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

"[A] 'judge's function' at summary judgment is not 'to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial.'"  *Tolan v. Cotton*, 134 S. Ct. 1861, 1866 (2014) (quoting *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986)).  Whether there is a genuine dispute as to a material fact depends upon whether the evidence presents a sufficient disagreement to

require submission to a jury. *See Anderson,* 477 U.S. at 248–49; *Stone v. Autoliv ASP, Inc.,* 210 F.3d 1132, 1136 (10th Cir. 2000); *Carey v. U.S. Postal Serv.,* 812 F.2d 621, 623 (10th Cir. 1987). A fact is "material" if it pertains to an element of a claim or defense; a factual dispute is "genuine" if the evidence is so contradictory that if the matter went to trial, a reasonable party could return a verdict for either party. *Anderson,* 477 U.S. at 248. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (*citing First Nat'l. Bank of Ariz. v. Cities Serv. Co.*, 391 U.S. 253, 289 (1968)). In reviewing a motion for summary judgment, the Court views all evidence in the light most favorable to the non-moving party. *See Garrett v. Hewlett-Packard Co.,* 305 F.3d 1210, 1213 (10th Cir. 2002).

**B.    Motion to Exclude Expert Testimony**

Rule 702 of the Federal Rules of Evidence provides:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if: (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue; (b) the testimony is based on sufficient facts or data; (c) the testimony is the product of reliable principles and methods; and (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. The Court "must satisfy itself that the proposed expert testimony is both reliable and relevant, in that it will assist the trier of fact, before permitting a jury to assess such testimony." *United States v. Rodriguez-Felix*, 450 F.3d 1117, 1122 (10th Cir. 2006). "While an expert witness's testimony must assist the jury to be deemed admissible, . . . it may not usurp the jury's fact-finding function." *Bio Med Techs. Corp.*

*v. Sorin CRM USA, Inc.*, No. 14-CV-0154-WJM-CBS, 2015 WL 7294791, at *2 (D. Colo. Nov. 19, 2015) (citations omitted).  The proponent of expert testimony bears the burden of proving the admissibility of the testimony by a preponderance of the evidence. *United States v. Nacchio*, 555 F.3d 1234, 1241 (10th Cir. 2009) (*en banc*).

## IV.   ANALYSIS

The Court's jurisdiction in this matter is based on diversity of citizenship under 28 U.S.C. § 1332(a) and, therefore, the Court applies the substantive law of Colorado.[3] *Etherton v. Owners Ins. Co.*, 829 F.3d 1209, 1223 (10th Cir. 2016).

### A.   Defendant's Motion for Summary Judgment on Plaintiff's Tort Claims

Defendant's Motion for Partial Summary Judgment on Plaintiff's three causes of action for fraud is premised entirely upon the Mutual Release the parties entered into as part of the transaction.[4]  Defendant argues that each of the fraud claims "is based on pre-contractual communications and negotiations" and thus falls squarely within the release provided in the Mutual Release and Plaintiff is barred from seeking further recovery for that conduct.  [#46, p. 7].  Plaintiff does not challenge that, if effective, the Mutual Release would release his fraud claims against Defendant.  Instead, Plaintiff contends that the Mutual Release was fraudulently induced and thus must be set aside.

---

[3] The APA contains a choice of law provision stating:  "The validity, performance and enforcement of this Agreement and all Transaction Documents, unless expressly provided to the contrary, shall be governed by the laws of the State of Colorado, without giving effect to the principles of conflicts of law of such state."  [#46-1, § 11.11].

[4] For the first time at the motion hearing, Defendant argued that Plaintiff could not seek to repudiate the Mutual Release while at the same time seeking to affirm other elements of the parties' agreement.  Arguments raised for the first time at oral argument, however, are considered waived and will not be considered by the Court.  *Corder v. Lewis Palmer Sch. Dist. No. 38*, 566 F.3d 1219, 1235 n.8 (10th Cir.2009); *Fed Ins. Co. v. Tri–State Ins. Co.*, 157 F.3d 800, 805 (10th Cir.1998); *Gocha v. Nat'l R.R. Passenger Corp.*, 75 F. Supp. 3d 1304, 1313 (D. Colo. 2014).

[#60, p. 2].  In its reply, Defendant argues that Plaintiff has failed to establish that the contract was induced by fraud because Defendant did not conceal or misrepresent any material fact that induced Plaintiff to enter into the agreement.  [#65, p. 1-2].

"Like any contract, a release procured through fraud can be set aside."  *Chase v. Dow Chem. Co.*, 875 F.2d 278, 281–82 (10th Cir. 1989) (citing *Dodds v. Frontier Chevrolet Sales & Serv., Inc.*, 676 P.2d 1237, 1238 (Colo.App.1990)).  In order to establish fraud, Plaintiff must prove:

> (1) a false representation of a material fact or a concealment of a material existing fact; (2) knowledge on the part of the one making the representation that it is false or knowledge that he is concealing a material fact that in equity or good conscience ought to be disclosed; (3) ignorance on the part of the one to whom the representation is made or from whom such fact is concealed of the falsity of the representation or of the existence of the fact concealed; (4) the representation or concealment is intended to be acted upon; (5) action is taken on the representation or concealment that causes damages.

*Chase*, 875 F.2d at 281 (citing *Morrison v. Goodspeed*, 68 P.2d 458, 462 (Colo. 1937)).

Here, Plaintiff alleges that the Mutual Release was procured through Defendants' false promise to allow him to exercise the Option Transaction.[5]  [#60-1, ¶ 21].  Although a claim for fraud may not be based upon the mere nonperformance of a contractual promise, "a promise concerning a future act, when coupled with a present intention not

---

[5] To the extent Plaintiff's fraud claims are based upon an allegation that Defendant failed to disclose that it "did not want to do business with Plaintiff," such a fact was neither concealed nor a material inducement for entering into the agreement.  [#60, p. 10].  On or about December 20, 2012, Defendant provided Plaintiff with a revised proposed term sheet that excluded the option for Plaintiff to repurchase the KC Stores despite Plaintiff's desire for such an option.  [#60, UF 8; #65, p. 2].  Defendant also included terms in the APA to limit Plaintiff's role in the operation of the business if he exercised the option.  [*See* #65, p. 5 n.2].  Moreover, there is no evidence to support a finding that Plaintiff entered into the APA or Mutual Release on the basis of a mistaken belief that Defendant actively desired to continue doing business with Defendant.  So long as Defendant was willing to honor the option, Defendant's desire to do business with Plaintiff was irrelevant.

to fulfill that promise, can be actionable fraud." *H & H Distribs., Inc. v. BBC Int'l, Inc.*, 812 P.2d 659, 662 (Colo. App. 1990); *see also Salba Corp. v. X Factor Holdings, LLC*, No. 12-CV-01306-REB-KLM, 2014 WL 4458891, at *3 (D. Colo. Sept. 10, 2014)(finding that allegations that party knowingly made false representations concerning its present intention to perform a future act sounded in fraud).

Plaintiff, however, fails to satisfy its burden to offer sufficient evidence such that a reasonable jury could find that Defendant did not intend to allow Plaintiff to exercise the Option Transaction at the time the APA was executed. Plaintiff does not offer any direct evidence, such as statements by Phillips 66 employees or actions undertaken by Defendant inconsistent with Plaintiff's exercise of the option,[6] to support its allegation that Defendant did not intend to allow Defendant to exercise the option. Instead, Plaintiff relies entirely on speculation and conjecture.

For example, Plaintiff testifies that he "now firmly believes" that Defendant only included the Option Transaction in the APA to induce him to execute the transaction. [#60-1, ¶ 19]. Plaintiff's subjective belief regarding Defendant's intent or motivation is not admissible evidence. Fed.R.Civ.P. 56(c)(4) (stating that affidavit opposing summary judgment "must be made on personal knowledge"); *Vesom v. Atchison Hosp. Ass'n*, 279 F. App'x 624, 634–35 (10th Cir. 2008) (finding that "subjective beliefs as to the intent, thoughts or motivations of others were correctly stricken"); *Hall v. Bellmon*, 935 F.2d 1106, 1111 (10th Cir.1991) (holding that "nonmovant's affidavits must be based upon

---

[6] To the contrary, in Plaintiff's Motion for Partial Summary Judgment on Defendant's Counterclaim, Plaintiff contends that Defendant "wait[ed] over half a year to make sure [Plaintiff] would not exercise his option before beginning work on the [KC Stores]." [#88, p. 10].

personal knowledge and set forth facts that would be admissible in evidence; conclusory and self-serving affidavits are not sufficient").

In addition to his own testimony, Plaintiff points to the following statements made in internal Phillips 66 documents to support his allegation that Defendant did not intend to allow Plaintiff to exercise the option at the time the APA was executed:

- An August 7, 2012 email exchange between two of Plaintiff's contacts at Phillips 66, stating "If I need to go to Denver tomorrow to tell [Plaintiff] we won't do business with him, I'll try to arrange that." [#60-3].

- An August 9, 2012 internal Phillips 66 email, in which the same employee states: "[Plaintiff's] abdication is a requirement, so no cases are being developed where he retains equity." [#60-4].

Although these emails may indicate that, as of early August 2012, Defendant did not intend to continue doing business with Plaintiff, they do not speak to the deal that ultimately was executed by the parties approximately six months later. Nor do they evidence any intent on the part of Defendant to deceive Plaintiff about its intentions.

On or about December 10, 2012, after months of negotiation, Defendant provided Plaintiff with a proposed term sheet that included an option for Plaintiff to repurchase the KC Stores. [#60, UF 7; #65, p. 2]. Plaintiff points to a PowerPoint presentation circulated internally at Phillips 66 on December 18, 2012 as evidence that Defendant did not intend to honor the option. Specifically, Plaintiff points to statements in the presentation indicating that there was a "[v]ery low probability of [Plaintiff's] success on [the] option" and that the possibility that Plaintiff would succeed in exercising the option represented a "market related risk." [#60, UF 16; *see also* #62, p. 10, 17]. Contrary to Plaintiff's interpretation, these statements and others in the presentation actually acknowledge Plaintiff's right to exercise the option and Defendant's intent to honor that right. For example, the presentation states: "[Plaintiff] **will have** 180-day

Buyback Option for 30 Kansas City stores for $47 MM."  [#62, p. 4 (emphasis added)].

Similarly, the fact that Defendant recognizes Plaintiff's exercise of the option as a "risk"

may indicate that Defendant preferred that Plaintiff not exercise the option, but it does

not indicate any intent not to allow Plaintiff to do so.

Contrary to Plaintiff's contention, the facts here are not parallel to those in *Chase*.

[#60, p. 9].  In *Chase*, the court set aside a settlement of plaintiff's claims for damage

allegedly caused by one of defendant's products where the undisputed evidence

showed that defendant had affirmatively represented to the plaintiff that its product had

not caused the damage and had concealed an internal report finding that the product

had, in fact, caused the damage.  *Chase*, 875 F.2d at 282.  Here, by contrast, there is

no such direct evidence of misrepresentation or concealment.

Plaintiff has failed to offer sufficient evidence to support a finding that Defendant

intended not to allow Plaintiff to exercise the Option Transaction at the time the parties

executed the APA or Mutual Release.  Plaintiff's speculation and conjecture regarding

Defendant's intent is insufficient to create a genuine issue of material fact.  *Bones*, 366

F.3d at 875 (holding that party's evidence must be based on more than mere

speculation, conjecture, or surmise to survive motion for summary judgment).

**B.    The Parties' Motions for Summary Judgment on Plaintiff's Contract
        Claim**

*1.    The Parties' Competing Contract Interpretations*

Although both parties contend that the contract provisions surrounding the Option

Transaction are unambiguous, each proposes a different interpretation to support its

respective motion for summary judgment.  When interpreting a contract, the Court

seeks "to ascertain and effectuate the intent of the parties as determined primarily from

the language of the contract." *E. Ridge of Fort Collins, LLC v. Larimer & Weld Irrigation Co.*, 109 P.3d 969, 974 (Colo. 2005). In the absence of a showing of contrary intent, the terms of a contract are ascribed their plain and ordinary meaning. *Green Earth Wellness Ctr., LLC v. Atain Specialty Ins. Co.*, 163 F. Supp. 3d 821, 827 (D. Colo. 2016). "The meaning of a contract is found by examination of the entire instrument and not by viewing clauses or phrases in isolation. Each word in an instrument is to be given meaning if at all possible." *U.S. Fidelity & Guar. Co. v. Budget Rent–A–Car Sys., Inc.*, 842 P.2d 208, 213 (Colo.1992) (internal citations and emphasis omitted). "The nature of the transaction which forms the contract subject matter must also be considered." *Stegall v. Little Johnson Assocs., Ltd.*, 996 F.2d 1043, 1048 (10th Cir. 1993) (citing *In re Marriage of Thomason*, 802 P.2d 1189, 1190 (Colo. App. 1990)).

The terms of a contract are ambiguous "where the text of the agreement reasonably allows for varying interpretations." *Theriot v. Colo. Ass'n of Soil Conservation Dists. Med. Benefit Plan*, 38 F. Supp. 2d 870, 877 (D. Colo. 1999). However, "[t]he mere fact that there is a difference of opinion between the parties regarding the interpretation of an instrument does not of itself create an ambiguity." *Radiology Prof'l Corp. v. Trinidad Area Health Ass'n, Inc.*, 577 P.2d 748, 750 (Colo. 1978). When the language of a contract is determined to be ambiguous and cannot be resolved by reference to other contractual provisions, "extrinsic evidence must be considered by the trial court in order to determine the mutual intent of the parties at the time of contracting." *Pepcol Mfg. Co. v. Denver Union Corp.*, 687 P.2d 1310, 1314 (Colo. 1984). Determination of the meaning of ambiguous language thus is generally a question of fact to be determined in the same manner as other issues of disputed fact.

*Id.*; *Palipchak v. Kent Constr. Co.*, 554 P.2d 718, 719 (Colo. App. 1976) (reversing grant of summary judgment where terms of contract found to be ambiguous).

Section 5.16.1 of the APA defines the Option Period as "the period beginning on the Closing Date [February 28, 2013] and ending 180 days after the Closing Date." [#46-1, § 5.16.1].  Section 5.16.1(f), however, provides that if Plaintiff does not receive a payment he is owed from a non-party to this lawsuit "on or before June 23, 2013, then the Option Period shall not expire until October 31, 2013." [#46-1, § 5.16.1(f)].  It is undisputed that the referenced payment was not made on or before June 23, 2013. [#84, UF 14; #94, p. 3 n. 1].

Section 5.16.2 identifies certain documentation, including the Option Notice and an executed lease, that Plaintiff must deliver to Defendant "no later than 150 days after the Closing Date" in order to enter into the Option Transaction.  [#46-1, § 5.16.2].  In addition, it provides that "[t]he closing of the Option Transaction will occur no later than 30 days after [Plaintiff] has timely delivered the Option Notice to [Defendant]." [*Id.*].  The final sentence of the section emphasizes the importance of these deadlines:  "If [Plaintiff] fails to deliver the written notice within the 150-day period described above, or if [Plaintiff] fails to close the Option Transaction within the 30-day period described above, then the option granted herein . . . shall terminate automatically, and the parties shall have no further rights or obligations under this Section 5.16.2."

Defendant argues that the 150-day deadline in section 5.16.2 is entirely separate from—and defined independent of—the Option Period and thus, regardless of any extension to the Option Period pursuant to section 5.16.1(f), the 150-day deadline for

providing the required documentation remained unaltered.[7]   Because it is undisputed that the documentation provided by Plaintiff prior to expiration of the 150-day period did not include an executed lease, Defendant contends it is entitled to summary judgment on Plaintiff's breach of contract claim.

The literal reading of section 5.16.2 advocated by Defendant, however, would render the extension of the Option Period provided for in Section 5.16.1(f) meaningless. If Section 5.16.2's 150-day and 30-day deadlines are strictly applied from the February 28, 2013 Closing Date, the 150-day deadline would have expired no later than July 29, 2013[8] and the Option Transaction would have had to close no later than August 28, 2013.   This interpretation of section 5.16.2 directly conflicts with the extension of the Option Period to October 31, 2013 provided for in section 5.16.1(f).    The language of section 5.16.1(f) expresses a clear intent of the parties to extend the Option Period to October 31, 2013 in the event that Plaintiff did not receive the referenced payment by June 23, 2013.  In order to give this provision and the parties' intent meaning, the Court finds that the periods defined in section 5.16.2 must be construed to account for the extension of the Option Period to October 31, 2013.

Plaintiff argues that the 150-day deadline should be extended consistent with the extension to the Option Period, such that he was not required to deliver the required documentation to Defendant until 30 days before the last day of the Option Period, October 1, 2013.   [#84, p. 13].   In support, Plaintiff contends that section 5.16.2 "as

_____

[7] Defendant's briefing on the motions for summary judgment does not address section 5.16.2's requirement that the Option Transaction close within 30 days after delivery of the Option Notice.

[8] July 29, 2013 is the first business day after the 150-day period expired on July 28, 2013.

written demonstrates the intent that [Plaintiff] be required to close the Option purchase on the last day of the Option Period, and deliver notice and other documents to [Defendant] at least 30 days before that." [*Id.*] Contrary to Plaintiff's contention, however, nothing in section 5.16.2 *required* Plaintiff to close the Option Transaction on the last day of the Option Period; Plaintiff was permitted to deliver the Option Notice at any time during the 150-day period and permitted to close the transaction at any time during the 30-day period that followed.

Based solely upon the language of the agreement, the parties' intent with regard to how the periods in section 5.16.2 would be extended to accommodate the extended Option Period is unclear. The parties may have intended, as Plaintiff suggests, to extend the 150-day period to allow Plaintiff up until 30 days before the close of the Option Period to provide the Option Notice and other required documentation. Alternatively, however, the parties may have intended for Defendant to receive notice of Plaintiff's intent to exercise the option no later than 150 days after the Closing Date, but to extend the 30-day period for closing the transaction to allow Defendant to utilize the payment referenced in Section 5.16.1(f).[9] The parties have not offered any extrinsic evidence with regard to the parties' intent in this regard.

---

[9] In its reply in support of its affirmative motion, Plaintiff contends that the APA did not contemplate that Plaintiff would be contributing any out-of-pocket funds toward the Option Transaction and thus that "the crucial task affected by [the unmade payment to Plaintiff] was not *closing* the Option purchase, but rather *obtaining* the third-party financing." [#106, p. 6 (emphasis in original)]. Plaintiff thus argues that the parties intended the 150-day period to extend to allow additional time for him to obtain the third party financing. Although this is one reasonable interpretation that Plaintiff may offer at trial, the Court does not believe it is conclusive or definitively resolves the ambiguity as to the parties' intent with regard to extending the 150-day and/or 30-day periods to accommodate the extended Option Period.

The Court thus finds that the provisions of section 5.16.2 are susceptible of multiple meanings and thus are ambiguous. Because this ambiguity cannot be resolved by reference to other contractual provisions, it is a disputed question of fact to be resolved by the trier of fact with the benefit of the parties' presentation of evidence at trial and is not properly resolved on summary judgment.

2.    *Defendant's Alternative Argument*

In the alternative, Defendant argues that, even if the 150-day deadline were extended as argued by Plaintiff, Defendant is still entitled to summary judgment on Plaintiff's contract claim because Plaintiff "never" provided the documentation required by section 5.16.2. [#94, p.2]. Plaintiff contends that any failure to perform was justified by Defendant's anticipatory breach. [#84, p. 14-16]. Specifically, Plaintiff contends that the letters sent by Defendant's outside counsel on August 5 and August 27 informing Plaintiff that he had "no rights" to execute the Option Transaction constituted an anticipatory breach. [*Id.*, p. 14].

Defendant does not dispute that the letters constituted a rejection of the Option Transaction, but instead argues that Plaintiff is precluded from asserting a claim for anticipatory breach because (1) the contract had already terminated at the time of any anticipatory breach; and (2) Plaintiff did not assert a separate claim for anticipatory breach in his complaint. [#94, p.6-9]. Defendant's first argument is dependent upon the imposition of the 150-day deadline, which as discussed above, is not appropriate for resolution on summary judgment. Defendant's second argument relies exclusively upon an out of circuit decision, in which the court was not applying Colorado law, to support its contention that a claim for anticipatory breach is "separate and distinct from a breach

of contract claim" and thus must be pleaded as a separate cause of action.  [#94, p. 8 (citing *Lasalle Bank Nat'l Ass'n v. Citicorp Real Estate, Inc.*, No. 01 civ. 4389, 2002 WL 181703, at *6 (S.D.N.Y. Feb. 5, 2002)].  The *Lasalle Bank* decision does not cite any authority for its holding that a claim for anticipatory breach must be stated as a separate cause of action.  *Id.*

In Colorado, the model jury instructions describe an anticipatory breach as a form of breach of a contract:  "A party to a contract who shows a clear and definite intention not to perform the contract before the time when (his) (her) (its) own performance (is due) (is to be completed) commits a breach of contract."  CJI-CIV 30:13; see also *Long v. Wright*, 197 P. 1016, 1017 (Colo. 1921) (holding that repudiation of contract amounted to breach of contract for which "suit may be immediately brought").  As such, the Court does not find the *Lassalle Bank* decision persuasive.

Defendant points to allegations in the Amended Complaint alleging that Plaintiff had fully performed his obligations under the agreement to argue that Plaintiff's claim of anticipatory breach represents "a complete reversal" of the allegations in the Amended Complaint and that allegations of Plaintiff's failure to perform certain obligations as a result of Defendant's repudiation are "nowhere to be found" in the Amended Complaint. [#94, p. 7-8 (citing #35, ¶¶ 9, 55-56)].  The Court disagrees.  As the Tenth Circuit has instructed, "notice pleading requires the plaintiff to allege just enough to put the defendant on notice of facts providing a right to recovery."  *Sipp v. Unumprovident Corp.*, 107 F. App'x 867, 875 (10th Cir. 2004) (quoting *Brokaw v. Mercer County*, 235 F.3d 1000, 1023 n.19 (7th Cir.2000)).  Here, Plaintiff alleged that he was "ready, willing and able to purchase the KC Stores within the time frame and parameters set forth in

the Purchase Option" but that Defendant "wrongly and unjustly breached its obligations under the Purchase Option and the Agreement by refusing to allow [Plaintiff] to exercise the Purchase Option." [#35, ¶¶ 48-49]. Particularly in the context of a motion for summary judgment where the Court "must liberally construe all of the non-movant's allegations," the Court finds these allegations sufficient to put Defendant on notice of Plaintiff's intent to assert an anticipatory breach. *Cayce v. Carter Oil Co.*, 618 F.2d 669, 672–73 (10th Cir. 1980).

### C. Plaintiff's Motion for Summary Judgment on Defendant's Counterclaim

Plaintiff asserts that Defendant is legally barred from bringing its counterclaim alleging that Plaintiff breached the APA by not delivering the stores in the condition represented and warranted, because Defendant violated the notification provision of the APA first and "[a] party to a contract cannot claim its benefit where he is the first to violate its terms." [#88, p.6 (quoting *Coors v. Sec. Life of Denver Ins. Co.*, 112 P.3d 59, 64 (Colo. 2005))].[10] Defendant does not challenge this legal principle but instead argues that Plaintiff misinterprets the notification provisions of the APA.

---

[10] Plaintiff also argues that Defendant has not offered any evidence to support its claim that the stores were not "in good repair and operating condition" at the time of sale. [#88, p. 8-10]. Plaintiff contends that Defendant made expenditures on the stores not to put them in operating condition but rather "to burnish [Defendant's] 'consumer image' and increase the Stores' value for resale." [#88, p. 8]. In response, Defendant offers the testimony of Charlie Lakey, a Retail Equity Director at Phillips 66 who was responsible for ascertaining the maintenance needs of the stores. [#99-1, ¶¶ 1, 8]. According to Mr. Lakey, "All of the stores required work beyond routine repair and maintenance work . . . All of this work was necessary to bring all the stores to good repair and good condition." [*Id.*, ¶ 5]. The work purportedly included repairing or replacing inoperable car washes, HVAC units, and gas pumps. [*Id.*, ¶ 7]. The Court finds this evidence sufficient to create a genuine issue of material fact with regard to whether or not the stores were "in good repair and operating condition" at the time of sale as represented and warranted by Plaintiff.

The notification provision provides:

 Each party will promptly notify the other party of any fact, event, circumstance or action

(a) that, if known on the date of this Agreement, would have been required to be disclosed to the other party pursuant to this Agreement,

(b) the existence or occurrence of which would cause any of such party's representations or warranties under this Agreement not to be correct and complete as of the Effective Time; or

(c) that could reasonably be expected to have a Material Adverse Effect."

[#46-1, § 5.7]  The APA defines Material Adverse Effect as "an adverse effect on the Assets, the Business, or the results of operations, prospects or condition (financial or otherwise) of the Business that equals or exceeds, individually or in the aggregate with other adverse effects, $250,000, as determined by the Buyer."[11]  [#46-1, § 1.1].

It is undisputed that Defendant had a contractor visually inspect the stores prior to executing the APA and that, prior to closing the transaction, Defendant received written reports from those inspections indicating that well in excess of $250,000 in maintenance expenditures were needed.  [#88, UF 6-8; #99, p. 2].  Plaintiff alleges that Defendant thus breached the notification provision by not notifying him of these maintenance expenditures because they constituted a fact or circumstance that both (1) would cause Plaintiff's representations or warranties not to be correct and complete; and (2) could reasonably be expected to have an adverse effect exceeding $250,000. [#88, p. 6-7].

Defendant responds that section 5.7 "imposes obligations on each party to tell the other if it discovers that its *own* representations and warranties are not correct and

complete."  [#99, p.6 (emphasis in original)].  Although Defendant characterizes section 5.7 in its entirety in this manner, only section 5.7(b) addresses the parties' representations and warranties.  With regard to that provision, the Court agrees that the plain and ordinary meaning of the phrase "such party's representations or warranties" limited the notification required under that provision to information that would cause that party's *own* representations or warranties not to be correct.  [#46-1, §5.7(b)].  As such, Defendant was not required to disclose information, such as the inspection reports, that would cause Plaintiff's representations or warranties not to be correct.

Defendant, however, ignores the language of section 5.7(c), which does not include the limiting language included in the other two provisions of the notification provision.  [*See* #46-1, § 5.7(a) ("the other party"); § 5.7(b) ("such party's")].  Rather, the plain and ordinary language of section 5.7(c) requires each party to promptly notify the other of any fact or circumstance that could reasonably be expected to have an adverse effect on the assets or business that equals or exceeds, individually or in the aggregate, $250,000.  [#46-1, §§ 1.1, 5.7(c)].  Defendant offers no alternative interpretation of this provision.  Nor does Defendant offer any explanation for why the inspection reports reflecting maintenance expenditures well in excess of $250,000 did not constitute a fact or circumstance likely to have an adverse effect on the assets or business.  "The court is under no obligation to make [Defendant's] arguments for [it]."  *Carter v. Colvin*, 27 F. Supp. 3d 1142, 1150 n.12 (D. Colo. 2014); *see also Perry v. Woodward*, 199 F.3d 1126, 1141 n.13 (10th Cir.1999) (stating that court "will not craft a party's arguments for him").

---

[11]  The APA defines "Assets" to include, *inter alia*, all buildings, structures and other improvements, along with all machinery and equipment, including car wash equipment, located at the store sites.  [#46-1, § 2.1 (c)-(d)].

The Court thus finds that the plain language of subsection c of the notification provision required the parties to disclose to one another any fact or circumstance that could reasonably be expected to have an adverse effect that equaled or exceeded $250,000. Defendant thus had an obligation under the contract to "promptly notify" Plaintiff of the inspection reports, which reflected maintenance expenditures for the stores well in excess of $250,000. Because Defendant was the first to violate the requirements of the APA with respect to the condition of the stores, Defendant cannot now "claim its benefit" by asserting a claim for breach of contract based upon the condition of the stores. *Coors,* 112 P.3d at 64.

### D.    Plaintiff's Motion to Exclude Expert Testimony of Glen Kunofsky

In order to exercise the Option Transaction, Plaintiff was required, *inter ilia*, to obtain a "triple net lease" with a "major credit grade store tenant" for the KC Stores. [#46-1, § 5.16.1(a)]. Defendant proposes to offer the expert testimony of Glen Kunofsky, a licensed real estate broker with fifteen years of experience with commercial leases, to opine about the meaning of these terms. [#77-2]. Plaintiff seeks to exclude Mr. Kunofsky's testimony relating to the phrase "major credit grade store tenant" on the grounds that it would not be helpful to the trier of fact and that it is unreliable.[12] [#77].

Plaintiff argues that the phrase "major credit grade store tenant" is unambiguous and thus that expert testimony would not "help the trier of fact . . . to determine a fact in issue." Tellingly, however, Plaintiff fails to offer any definition of the phrase, stating only that the words should be given "their plain and ordinary meaning." [#77, p. 4]. The Court disagrees that the phrase is unambiguous. The word "major" is itself susceptible

of multiple meanings depending on the context.  Here, the contract fails to provide any guidance as to which potential "store tenants" are to be considered "major" and which would not meet that qualification.  Similarly, the agreement provides no guidance with regard to what credit "grade" a potential leasee must have or as to how much "credit" the leasee must have access.  Because the phrase "major credit grade store tenant" is ambiguous,[13] the Court finds that appropriate expert testimony may be useful to the trier of fact in resolving that ambiguity.  *See Kona Tech. Corp. v. Southern Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir. 2000).

The Court finds the decision in *Texas Instruments, Inc. v. BIAX Corp.*, No. 07-cv-02370-WDM-MEH, 2009 WL 535781 (D. Colo. Mar. 2, 2009), relied upon by Plaintiff, distinguishable.  In *Texas Instruments*, the court found that the dispute involved the interpretation of "basic contract terms" involving "common business and legal concepts, written in plain and understandable language, not involving any particular expertise regarding the underlying technology."  *Id.* at *1.  Moreover, the court noted that the proposed expert appeared to base his testimony "purely on his reading of the contract terms, and he makes no reference to any industry usage, custom, or standard regarding specific words or phrases."  *Id.*  Here, by contrast, the phrase at issue is not a basic contract term written in plain and understandable language but rather is an ambiguous phrase embodying a technical commercial leasing requirement.  In addition, Mr. Kunofsky's testimony is not based solely upon the language of the contract but rather focuses on industry custom.  [See #77-2, p. 3-4].

---

[12] Plaintiff does not challenge the qualifications of Mr. Kunofsky to serve as an expert witness.  [#77, p. 3].

[13] Notably, at oral argument, Plaintiff's counsel struggled to define the phrase.

Plaintiff next argues that Mr. Kunofsky's proposed testimony would not be helpful to the trier of fact because he "does not interpret" the term "major credit grade store tenant" but rather "redefines [it], without explanation, and then opines on the meaning of those *different* terms."   [#77, p. 6 (emphasis in original)].   Although Mr. Kunofsky focuses his report on a discussion of the phrase "investment grade tenant," he does so only after stating his understanding, as an expert in the field, that "a major grade store tenant, as used in the APA, [ ] mean[s] an investment grade tenant."  [#77-2, p. 3].  To the extent Mr. Kunofsky's testimony is offered, Plaintiff will be free to cross-examine him about how he reached that conclusion and any potential differences between the two terms.

Finally, Plaintiff argues that Mr. Kunofsky's testimony should be excluded because he did not consider the actual analysis conducted by Defendant to determine whether Buchanan Energy, Inc. was a "major credit grade store tenant" and the explanation of the term he provides varies from the analysis Defendant performed. [#77, p. 7-8].  Plaintiff's concern regarding the factual basis for Mr. Kunofsky's findings however, does not support exclusion.  As this court has recognized:

> As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross examination. Only if the expert's opinion is so fundamentally unsupported that it can offer no assistance to the jury must such testimony be excluded.

*Squires ex rel. Squires v. Goodwin*, 829 F. Supp. 2d 1041, 1056 (D. Colo. 2011) (quoting *Bonner v. ISP Techs., Inc.*, 259 F.3d 924, 929-30 (8th Cir. 2001)).  Because Mr. Kunofsky's qualifications as an expert are not challenged and his opinions are supported by an explanation based upon his experience in the industry, the Court finds

that his testimony is not "so fundamentally unsupported that it can offer no assistance to the [trier of fact]."

In sum, the Court finds that, because the term "major credit grade store tenant" is ambiguous, Mr. Kunofsky's testimony regarding his understanding of that term based upon his experience in the commercial lease industry may be useful to the trier of fact. Plaintiff's concerns regarding the soundness of his opinions go to the credibility not admissibility of the testimony and may be scrutinized through cross examination. As the Tenth Circuit has instructed "[d]oubts about whether an expert's testimony will be useful should generally be resolved in favor of admissibility unless there are strong factors such as time or surprise favoring exclusions." *Robinson v. Missouri Pac. R.R. Co.*, 16 F.3d 1083, 1090 (10th Cir. 1994) (quotation omitted).

## V.    CONCLUSION

For the foregoing reasons, this Court respectfully **RECOMMENDS** that:

(1)    Defendant's Motion for Partial Summary Judgment on Plaintiff's Tort Claims [#46] be **GRANTED** and that summary judgment be entered in favor of Defendant on Plaintiff's three causes of action for fraud;

(2)    Defendant's Motion for Partial Summary Judgment on Plaintiff's Contract Claim [#76] be **DENIED**;

(3)    Plaintiff's Motion for Partial Summary Judgment on his Affirmative Claim for Breach of Contract [#87] be **DENIED**;

(4)    Plaintiff's Motion for Partial Summary Judgment on Defendant's Counterclaim [#88] be **GRANTED** and that summary judgment be entered in favor of Plaintiff on Defendant's counterclaim for breach of Plaintiff's representation and

warranty that the stores were in good repair and operating condition; and

      (5)     Plaintiff's Motion to Exclude Expert Testimony of Glen Kunofsky [#77] be

**DENIED**.[14]


DATED:  November 1, 2016               BY THE COURT:

                                         s/Scott T. Varholak
                                         United States Magistrate Judge

---

[14] Within fourteen days after service of a copy of this Recommendation, any party may serve and file written objections to the Magistrate Judge's proposed findings and recommendations with the Clerk of the United States District Court for the District of Colorado. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *Griego v. Padilla (In re Griego)*, 64 F.3d 580, 583 (10th Cir. 1995).  A general objection that does not put the District Court on notice of the basis for the objection will not preserve the objection for *de novo* review.  "[A] party's objections to the magistrate judge's report and recommendation must be both timely and specific to preserve an issue for *de novo* review by the district court or for appellate review."  *United States v. 2121 East 30th Street*, 73 F.3d 1057, 1060 (10th Cir. 1996).  Failure to make timely objections may bar *de novo* review by the District Judge of the Magistrate Judge's proposed findings and recommendations and will result in a waiver of the right to appeal from a judgment of the district court based on the proposed findings and recommendations of the magistrate judge. *See Vega v. Suthers*, 195 F.3d 573, 579-80 (10th Cir. 1999) (holding that district court's decision to review magistrate judge's recommendation *de novo* despite lack of an objection does not preclude application of "firm waiver rule"); *Int'l Surplus Lines Ins. Co. v. Wyoming Coal Refining Sys., Inc.*, 52 F.3d 901, 904 (10th Cir. 1995) (finding that cross-claimant waived right to appeal certain portions of magistrate judge's order by failing to object to those portions); *Ayala v. United States*, 980 F.2d 1342, 1352 (10th Cir. 1992) (finding that plaintiffs waived their right to appeal the Magistrate Judge's ruling by failing to file objections). *But see, Morales-Fernandez v. INS*, 418 F.3d 1116, 1122 (10th Cir. 2005) (holding that firm waiver rule does not apply when the interests of justice require review).